(Slip Opinion)

# Constitutionality of Race-Based Department of Education Programs

Certain race-based grant programs administered by the Department of Education violate the Fifth Amendment's equal-protection component.

December 2, 2025

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF EDUCATION

The Department of Education administers grants, preferences, and scholarships that distinguish between beneficiaries based on race. You have asked us to consider whether several such programs are unconstitutional after the Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141 (2023) ("*SFFA*"), and if so, whether the race-based portions of those programs are inseverable. *See generally* Memorandum for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Candice Jackson, Acting General Counsel, Department of Education, *Re: Request to Review the Constitutionality of U.S. Department of Education Programs with Racial and Ethnic Preferences or Quotas* (Aug. 15, 2025) ("Department of Education Memo").

Many of these programs restrict award eligibility to educational institutions whose student bodies reflect a particular racial composition. The Developing Hispanic-Serving Institutions program, for instance, is open only to educational institutions whose student bodies are 25 percent Hispanic or more. The Alaskan Native and Native Hawaiian-Serving Institutions program similarly restricts eligibility to institutions with at least a certain percentage of Alaska Native and Native Hawaiian students. Other programs award benefits to students directly. The implementing regulations governing the Ronald E. McNair Postbaccalaureate Achievement program, for example, instruct that grants must be directed to students from designated racial groups.

Our analysis proceeds in three parts. In Part I, we articulate the equal-protection standards that govern our review. In Part II, we describe the severability doctrine. We apply these standards in Part III and conclude that, with a handful of exceptions, the race-based portions of the Department of Education programs are unconstitutional and inseverable from their surrounding statutory schemes.

1

## I.

Any allocation of benefits and burdens based on a person's race is anathema to the U.S. Constitution. That document provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. And for half a century, our national charter has been understood as "prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citation omitted).[1]

Nevertheless, some forms of racism have been deemed "politically acceptable," *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 610 (1990) (O'Connor, J., dissenting)—even laudable in some quarters. Consequently, government programs have not always lived up to the truth that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). To effectuate that constitutional promise, the Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 143 S. Ct. at 2170 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). And after *SFFA*, it is now unmistakably clear that this test applies to *all* racial distinctions in education, however benign they may appear.

### A.

Any discussion of racial preferences in education must start with the "ignoble history," *id.* at 2159, of *Plessy v. Ferguson*. That case infamously held that the Fourteenth Amendment's Equal Protection Clause "could not have been intended to abolish distinctions based upon color." 163 U.S. at 544. "Laws permitting, and even requiring, the[] separation [of races]," *Plessy* insisted, "do not necessarily imply the inferiority of either race to the other." *Id.* As prophesized by Justice Harlan's lone dissent in *Plessy*,

---

[1] *Cf. United States v. Vaello Madero*, 142 S. Ct. 1539, 1544 (2022) (Thomas, J., concurring) ("Firmer ground for prohibiting the Federal Government from discriminating on the basis of race . . . may well be found in the Fourteenth Amendment's Citizenship Clause.").

"the inherent folly of that approach—of trying to derive equality from inequality—soon became apparent." *SFFA*, 143 S. Ct. at 2160; *see also* 163 U.S. at 559–62 (Harlan, J., dissenting). Even still, the Supreme Court continued to permit different treatment when it was considered benign, particularly in government grantmaking and affirmative action in college admissions.

### 1.

In the late 1980s, the Supreme Court recognized that government contracts are finite in number, so providing contracting benefits to a particular racial group works to the detriment of others. In *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989), the Court considered a local ordinance that required city contractors to subcontract at least 30 percent of the contract's value to entities that were "'at least fifty-one (51) percent'" owned and controlled by racial minorities, *id.* at 478 (citation omitted). The Court concluded that the ordinance failed strict scrutiny. *See id.* at 498–508; *see also id.* at 520 (Scalia, J., concurring in the judgment). It rejected as too "amorphous" the city's claim that it was "attempting to remedy various forms of past discrimination," *id.* at 498–99 (majority opinion), which was premised largely on "the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond," *id.* at 501.

Six years later, the Court in *Adarand Constructors, Inc. v. Peña* extended *Croson*'s holding about city contracts to federal contracts. 515 U.S. 200, 227 (1995). The Court considered a congressional enactment that had deemed certain racial and ethnic minority groups to be socially disadvantaged, *id.* at 206–08, and that had established a "'Government-wide goal for participation'" by minority-owned businesses at "'not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year,'" *id.* at 206 (quoting 15 U.S.C. § 644(g)(1)(ii)). The Supreme Court found that strict scrutiny applied to the Department of Transportation's efforts to implement that program through financial incentives to contractors that hired minority-owned businesses. *Id.* at 227, 235.

Consistent with Supreme Court precedent, this Office's longstanding view has been that such race-based preferences must satisfy strict scrutiny. "Although *Adarand* involved government contracting, it is clear from

the Supreme Court's decision that the strict scrutiny standard of review applies whenever the federal government voluntarily adopts a racial or ethnic classification as a basis for decisionmaking," including "in health and education programs, and in federal employment." *Legal Guidance on the Implications of the Supreme Court's Decision in* Adarand Constructors, Inc. v. Peña, 19 Op. O.L.C. 171, 177 (1995) ("1995 Guidance Memo").

**2.**

It took even longer for the Court to fully eradicate racial discrimination from school admissions. This is perhaps unsurprising given that *Plessy* itself recognized that "[t]he most common instance" of putatively valid racial discrimination at the time was "the establishment of separate schools for white and colored children." 163 U.S. at 544.

*Brown v. Board of Education*, 347 U.S. 483 (1954), announced the removal of race discrimination from the classroom. It held that "[s]eparate educational facilities are inherently unequal." *Id.* at 495. And because public education "must be made available to all on equal terms," *id.* at 493, the Court held that segregation "deprived [the plaintiffs] of the equal protection of the laws guaranteed by the Fourteenth Amendment," *id.* at 495. Following this landmark ruling, the Court nominally subjected "[a]ny exception to the Constitution's demand for equal protection" to "a daunting two-step examination known . . . as 'strict scrutiny.'" *SFFA*, 143 S. Ct. at 2162 (citation omitted). Racial classification, it claimed, was permissible only if "used to further compelling governmental interests" and if "narrowly tailored—meaning necessary—to achieve that interest." *Id.* (quotation marks and citations omitted).

Nevertheless, the Court endorsed certain race-based admissions policies over the following decades, on the premise that such policies were appropriately tailored to promote an interest that it concluded was compelling: racial diversity in higher education. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 311–12 (1978) (Powell, J.); *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003); *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 388 (2016). But even this permissive precedent made it clear that "a university's freedom" to consider race in admissions "was not unlimited." *SFFA*, 143 S. Ct. at 2163. Quota systems, for example, necessarily failed to be narrowly tailored. *See Grutter*, 539 U.S. at 334.

In 2023, the Court returned to the noble trail that *Brown* had blazed. It held unlawful the race-preferential admissions programs of Harvard University and the University of North Carolina at Chapel Hill. *SFFA*, 143 S. Ct. at 2175. Although a government may have a compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," *id.* at 2162, the Court concluded that the state-asserted interests that stem from diversity in higher education are not "sufficiently coherent for purposes of strict scrutiny," *id.* at 2166. Moreover, the racial categories commonly employed by universities—such as "Asian" or "Hispanic"—were "plainly overbroad" or "arbitrary or undefined." *Id.* at 2167.

Important for present purposes, the Court recognized as a matter of law what college administrators already knew as a matter of fact: As with government contracting, "[c]ollege admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 2169. Further, the Court emphasized that while there may be some remedial action taken to address past discrimination, it *must* have "a 'logical end point.'" *Id.* at 2170 (quoting *Grutter*, 539 U.S. at 342). And universities do not get to define that endpoint by referring to "some rough percentage of various racial groups" that they deem adequately diverse, which constitutes racial balancing by another name. *Id.* at 2172.

## B.

The foregoing cases establish and reaffirm the principle that the "strict scrutiny standard of review applies *whenever* the federal government voluntarily adopts a racial or ethnic classification as a basis for decisionmaking." 1995 Guidance Memo, 19 Op. O.L.C. at 177 (emphasis added). To be sure, "the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*." *Adarand*, 515 U.S. at 227 (emphasis in original). But an individual's *personal* equal-protection rights are no less violated when the government uses race to distinguish between organizations (as in *Croson* and *Adarand*) than when it uses race to distinguish between individuals (as in *SFFA*). *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 357–59 (6th Cir. 2021) (invalidating a federal COVID-19 relief program that gave preference to restaurants that were at least 51 percent owned and controlled by racial minorities).

Moreover, "blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis"—whether the pronouncement comes from Congress or the Executive. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 744–45 (2007) (plurality opinion) (quoting *Croson*, 488 U.S. at 501); *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1040 (Fed. Cir. 2008) ("Congress is entitled to no deference in determining whether Congress had a compelling interest in enacting [a] racial classification." (citation omitted)). The government's use of racial classifications to confer benefits or burdens is subject to strict scrutiny in all circumstances.

Under strict scrutiny, the government bears the burden of proving that the challenged classifications and programs survive it. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) ("*Fisher I*") (quoting *Croson*, 488 U.S. at 505). This analysis itself has two steps.

*First*, the government must demonstrate that "the racial classification is used to 'further compelling governmental interests.'" *SFFA*, 143 S. Ct. at 2162 (quoting *Grutter*, 539 U.S. at 326). Following *SFFA*, the Court recognizes "only two compelling interests that permit resort to race-based government action." *Id.* The only interest relevant here is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Id.*[2]

To establish this interest is present, the government faces a heavy burden. It must demonstrate specific instances of historical discrimination imposed by, or in violation of, some positive law. *Id.*; *see also United States v. Skrmetti*, 145 S. Ct. 1816, 1853 (2025) (Barrett, J., concurring) ("For purposes of the Fourteenth Amendment, the relevant question is whether the group has been subject to a longstanding pattern of discrimination *in the law*." (emphasis in original)).[3] The desire to "alleviate the

---

[2] The other interest—not relevant here—is protecting immediate safety, such as in the context of a prison during a race riot. *SFFA*, 143 S. Ct. at 2162 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

[3] Courts disagree about the extent to which government participation in the past discrimination is necessary to justify race-based remedial measures. *Compare, e.g.*, *Vitolo*, 999 F.3d at 361 ("[T]he government must have had a hand in the past discrimination it now seeks to remedy."), *with Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 481 (N.D. Tex. 2024) ("[G]overnment participation isn't always necessary, but it is sufficient."), *appeal dismissed*, No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024).

effects of societal discrimination" is not sufficient by itself. *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996); *see also Croson*, 488 U.S. at 505–06. Moreover, those instances of past discrimination must be proven by particularized evidentiary findings by the entity asserting that there is a compelling interest. *SFFA*, 143 S. Ct. at 2162; *see also* 1995 Guidance Memo, 19 Op. O.L.C. at 200. "A generalized assertion of past discrimination in a particular industry or region is not adequate," *Shaw*, 517 U.S. at 909, and "[s]tatistical disparities don't cut it," *Vitolo*, 999 F.3d at 361. The government "must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it embarks on an affirmative-action program." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249–50 (2022) (per curiam) (internal quotation marks and some emphasis omitted) (quoting *Shaw*, 517 U.S. at 910). Compiling a historical record after the fact will not do; the specific instances of discrimination must have been the actual basis on which Congress decided to classify people or institutions along racial lines.[4]

*Second*, if the government establishes a compelling interest, it must then demonstrate why its "use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 143 S. Ct. at 2162 (quoting *Fisher I*, 570 U.S. at 311–12). We have identified at least five relevant factors for determining whether a race-based government action is narrowly tailored:

> (1) whether the race-based measures are applied flexibly or amount to a per se unconstitutional quota*, see Grutter*, 539 U.S. at 334; 1995 Guidance Memo, 19 Op. O.L.C. at 192–93;

> (2) whether the government has made a good-faith effort to achieve its policy goals through "workable race-neutral alternatives," *Fisher I*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339–40);

---

The Supreme Court has explained that states "'must identify . . . discrimination, *public or private*, with some specificity before they may use race-conscious relief.'" *Shaw*, 517 U.S. at 909 (emphasis added) (quoting *Croson*, 488 U.S. at 504). We need not resolve this tension, because the relevant programs here fail under even the more lenient approach.

[4] If Congress *reauthorizes* an existing program, courts will look at the record at the time of reauthorization. *See Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1328 (Fed. Cir. 2001). But "if the pre-reauthorization evidence is insufficient to maintain the program when the program is challenged as reauthorized, the program must be invalidated, regardless of the extent of post-reauthorization evidence." *Id.* at 1327–28.

(3) whether the program has a definite duration, including whether it undergoes "periodic review," *SFFA*, 143 S. Ct. at 2173, so "that it 'will not last longer than the discriminatory effects it is designed to eliminate,'" *Adarand*, 515 U.S. at 238 (citation omitted); *cf. Shelby County v. Holder*, 570 U.S. 529, 553 (2013);

(4) whether the measure uses "arbitrary or undefined" racial categories, *SFFA*, 143 S. Ct. at 2167; and

(5) whether, based on "the scale of the exclusionary effect" caused by the program, the government has made appropriate steps to minimize the burden on other racial groups, 1995 Guidance Memo, 19 Op. O.L.C. at 196.

Beyond these five factors, the Court in *SFFA* also made clear that "race may never be used as a 'negative.'" 143 S. Ct. at 2168. The Court found it "hard to take seriously" the universities' argument that "race is never a negative factor in their admissions programs." *Id.* at 2169. "College admissions are zero-sum," so "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id. SFFA* suggests that racial classifications are *never* narrowly tailored when the government uses race to allocate a zero-sum benefit. For the reasons below, however, we need not decide whether using racial classifications to allocate zero-sum benefits would be independently fatal to a program: The programs we were asked to review fail narrow tailoring either way.

## C.

Equal-protection questions are especially nuanced when it comes to federal preferences for Indian tribes and other native peoples, such as Alaska Natives and Native Hawaiians. The Supreme Court has held that Congress has "'plenary and exclusive'" authority "to legislate with respect to the Indian tribes." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1627 (2023) (quoting *United States v. Lara*, 541 U.S. 193, 200 (2004)). That power derives from the Indian Commerce Clause, *see* U.S. Const. art. I, § 8, cl. 3, the Treaty Clause, *see id.* art. II, § 2, cl. 2, and "principles inherent in the Constitution's structure," *Brackeen*, 143 S. Ct. at 1628. But "'plenary' does not mean 'free-floating,'" *id.* at 1627, and "Congress's authority to legislate with respect to Indians is not unbounded," *id.*

at 1629. Like its other powers, Congress's ability to legislate vis-à-vis Indians is "subject to . . . pertinent constitutional restrictions." *United States v. Creek Nation*, 295 U.S. 103, 110 (1935). One such restriction is the Fifth Amendment's equal-protection component.

Current equal-protection doctrine recognizes a difference between preferences based on Indian ethnicity and those based on affiliation (often membership or citizenship) in a federally recognized tribe. Preferences of the latter type are linked to the quasi-sovereign, government-to-government relationship that persists in law between the United States and recognized Indian tribes, a relationship "rooted in the unique status of Indians as 'a separate people' with their own political institutions." *United States v. Antelope*, 430 U.S. 641, 646 (1977); *see also Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (treaty rights); *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 170–71 (1973) (rejecting state taxation of Indian property on reservations); *Williams v. Lee*, 358 U.S. 217, 223 (1959) (authority over Indian lands).

In *Morton v. Mancari*, the Supreme Court applied rational-basis review to a Bureau of Indian Affairs ("BIA") hiring preference for members of federally recognized tribes. 417 U.S. 535, 553–54 (1974). The Court chose that constitutional framework because the preference was "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* at 554. Indeed, the hiring preference "operate[d] to exclude many individuals who [we]re racially . . . classified as 'Indians.'" *Id.* at 553 n.24. Reciprocally, not all tribal membership is based on ethnicity, blood, or other indicia of race. *See, e.g.*, *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 139–40 (D.D.C. 2017) (discussing the Cherokee Freedmen, black descendants of slaves who have at times been recognized as citizens by the Cherokee Nation); S. Alan Ray, *A Race or a Nation? Cherokee National Identity and the Status of Freedmen's Descendants*, 12 Mich. J. Race & L. 387, 390–94 (2007) (same). "In this sense, the preference [in *Mancari* was] political rather than racial in nature." 417 U.S. at 553 n.24.

Without such a tie to "quasi-sovereign tribal entities," however, *id.* at 554, preferences for nontribal Indians may be "using racial or ethnic classifications," Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Todd David Peterson, Deputy

9

Assistant Attorney General, Office of Legal Counsel, *Re: HHS Report on H.R. 1833, Tribal Self-Governance Amendments of 1997* at 3 (Oct. 30, 1997); *see also Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 n.1 (9th Cir. 2004).[5] Although "the political-versus-racial classification is not always easy to identify," *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 734 (9th Cir. 2003), we have recognized at least two prerequisites to a permissible political classification.

*First*, the distinction must be drawn based on membership, citizenship, or a similar affiliation in a federally recognized political entity. "[T]he unique legal status of Indian tribes under federal law permits the Federal Government to enact legislation singling out *tribal* Indians, legislation that might otherwise be constitutionally offensive." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500–01 (1979) (emphasis added) (quotation marks omitted) (quoting *Mancari*, 417 U.S. at 551–52). Congress has "an obligation of trust to protect the rights and interests of federally recognized tribes and to promote their self-determination." *United States v. Hardman*, 297 F.3d 1116, 1128 (10th Cir. 2002) (en banc) (citation omitted). The requirement of federal recognition "spring[s] from history and from the text of the Constitution" and "is consistent with the Supreme Court's longstanding interpretation of the federal government's relationship with Native American tribes." *United States v. Wilgus*, 638 F.3d 1274, 1285–86 (10th Cir. 2011). When Congress legislates pursuant to this trust obligation, it engages with Indian tribes as quasi-sovereign entities in a government-to-government relationship. And because "[f]ederal recognition is a prerequisite to an Indian tribe possessing a government-to-government relationship with the United States," *Agua Caliente Tribe of Cupeño Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1213 (9th Cir. 2019) (cleaned up), a preference must classify persons based on their affiliation with a federally recognized tribe to be considered a political classification.

---

[5] We have explained that Congress may be able to extend such benefits "beyond members of federally recognized tribes to individuals . . . recognized by the tribal entity as having a clear and close affiliation with the tribal entity," such as a spouse or dependent of a member who is himself not eligible for membership. Memorandum for Jamie E. Brown, Acting Assistant Attorney General, Office of Legislative Affairs, from Sheldon Bradshaw, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 556, Indian Health Care Improvement Act Reauthorization of 2003* (May 12, 2003).

For Alaska Natives, this requirement may be met when legislation draws distinctions based on individuals' affiliation with "federally recognized Alaska Native villages." Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Sheldon Bradshaw, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 212, the Indian Health Care Improvement Act Reauthorization of 2001* at 2 (Sept. 7, 2001).[6] Such tribal organizations are listed on the Department of the Interior registry of recognized Native entities. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 944, 944–48 (Jan. 8, 2024); *see also Agua Caliente Tribe*, 932 F.3d at 1217 ("[A] federally recognized Indian tribe is an entity listed" by the Department of the Interior, "which the Secretary currently acknowledges as an Indian tribe and with which the United States maintains a government-to-government relationship." (cleaned up)). These federally recognized Alaskan Native entities thus "maintain[] a government-to-government relationship with the United States," and the United States engages with such villages as "political entit[ies]." *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 992 (9th Cir. 2020).

There are, however, no federally recognized Native Hawaiian or Native Pacific Islander political entities with which the United States has maintained a government-to-government relationship. *See* 89 Fed. Reg. at 944–48 (listing no federally recognized Native entities in Hawaii). Thus, there is no equivalent political status from which constitutionally permissible preferences for those groups might flow.[7]

---

[6] *See also* Memorandum for Sheryl L. Walter, Acting Assistant Attorney General, Office of Legislative Affairs, from Robert Delahunty, Special Counsel, Office of Legal Counsel, *Re: H.R. 1, No Child Left Behind Act (Elementary and Secondary Education Act of 1965 Reauthorization)* at 9 n.8 (Apr. 5, 2001) ("Delahunty Memo").

[7] In reaching this conclusion, we have considered two potential counterarguments. The first involves a 2016 Department of the Interior rule that set forth a process by which a future Native Hawaiian government could "seek a formal relationship with the federal government, analogous to the relationship between federally recognized tribes and the United States." *Cohen's Handbook of Federal Indian Law* § 13.02[3] (2025 ed.) ("*Cohen's*") (citing Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community, 81 Fed. Reg. 71,278, 71,318 (Oct. 14, 2016) (codified at 43 C.F.R. § 50)). The rule provides an avenue by which a Native Hawaiian community can reorganize into a unified government and submit a formal request for a government-to-government relationship with the United States. 81 Fed. Reg.

*Second*, we consider whether the preference involves "uniquely Indian interests"—such as Indian lands, treaties, and political institutions—or whether the program merely includes Indians along the way to broader purposes that overshoot "'Congress' unique obligation toward the Indians.'" *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997) (quoting *Mancari*, 417 U.S. at 555); *cf. Peyote Exemption for Native American Church*, 5 Op. O.L.C. 403, 420 (1981) ("*Peyote Exemption*") ("An exemption for Indian religious use of peyote would not be grounded in the unique political status of Indians."). For example, "legislation directly affecting Indian land, tribal status, self-government or culture" is more likely to be reviewed under *Mancari*'s more lenient standard, "even if a preference for Indians were found to have a racial component." Delahunty Memo at 8 (cleaned up). By contrast, "preferential treatment for Indians" that is "not reasonably linked to the distinctive status of Indian political institutions would likely be reviewed under *Adarand*'s strict scrutiny standard"—"even for those provisions applying to Indians because of their membership in a federally recognized tribal entity." *Id.*; *see also Kahawaiolaa*, 386 F.3d at 1279 ("We reject the notion that distinctions

---

at 71,285–86. In the decade since that rule was issued, however, no Native Hawaiian community has availed itself of this opportunity. *See* 89 Fed. Reg. at 944–48; *Agua Caliente Tribe*, 932 F.3d at 1217; *Wyandot Nation of Kan. v. United States*, 858 F.3d 1392, 1398 (Fed. Cir. 2017) ("We are persuaded that the List Act regulatory scheme exclusively governs federal recognition of Indian tribes."). And even if Native Hawaiians availed themselves of the pathway to tribal recognition outlined by that rule, it is uncertain whether Native Hawaiians could *ever* be subject to the *Mancari* special relationship. *See Rice v. Cayetano*, 528 U.S. 495, 518 (2000) (noting, without resolving, the "dispute" about "whether Congress may treat the native Hawaiians as it does the Indian tribes"). Like the Court in *Rice*, we need not resolve that dispute today because it is unnecessary to our analysis of the programs about which you have sought our advice.

The second counterargument suggests that the many statutes Congress has enacted over the years for the benefit of Native Hawaiians establish a special relationship for *Mancari*'s purposes. *See id.* at 533–34 (Stevens, J., dissenting); *see also, e.g.*, 20 U.S.C. § 7512(12)(B) ("Congress does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship."). But as the majority in *Rice* implicitly recognized, none of these enactments confers formal federal recognition on any Native Hawaiian political entity, which is why no such entity appears on the Department of the Interior's federal recognition list.

based on Indian or tribal status can never be racial classifications subject to strict scrutiny.").[8]

Outside the "exceedingly narrow" circumstances in which both prerequisites are satisfied, *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 880 (9th Cir. 2006) (en banc) (Bybee, J., dissenting); *see also* Delahunty Memo at 6–7, allocating preferences to Indians "as a discrete racial group" is subject to strict scrutiny like any other racial classification, *Mancari*, 417 U.S. at 554; *see also Cohen's* § 17.03[2][b][ii] ("Legislation dealing with Indians as a discrete class, but not" designed to fulfill "distinct federal obligations to Indians," should be tested under strict scrutiny.). For example, *Rice v. Cayetano* considered a Hawaii voting law that allowed only "native Hawaiians" to cast ballots for the trustees of the Office of Hawaiian Affairs. 528 U.S. at 498–99. Relying in part on the state law's definition of "native Hawaiians" by reference to ancestry, *id.* at 509–10, the Court held the distinction violated the Fifteenth Amendment's guarantee that governments may not deny citizens the right to vote "on account of race," *id.* at 522. The majority rejected Hawaii's attempt to characterize the law as a political rather than a racial classification, noting that the statute used ancestry as "a proxy for race." *Id.* at 514.

## II.

In exercising his power and responsibility to faithfully execute the laws—including congressional appropriations—the President at times will confront situations where "[o]ne provision of a statute may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity." *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 45 Op. O.L.C.

---

[8] To be sure, nothing prevents the federal government from enacting facially neutral legislation that has the effect of improving Indian students' representation in educational settings. After all, "the government's general trust obligation [can be] discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (cleaned up). But singling out tribal affiliates or members to receive benefits without a uniquely Indian interest at stake suggests that the related classification is more likely to be racial rather than political. *See Arakaki v. Lingle*, 477 F.3d 1048, 1068 (9th Cir. 2007) ("As *Rice* illustrates, an 'Indian tribe' may be classified as a 'racial group,'" triggering "strict scrutiny." (citation omitted)).

__, *15 (July 8, 2021) ("*Tenure Protection*") (cleaned up) (quoting *Loeb v. Trs. of Columbia Twp.*, 179 U.S. 472, 490 (1900)). In cases involving mandatory appropriations, the President must decide whether such unconstitutional provisions are severable from the rest of a program, thus allowing him to execute the remaining part of the law by spending funds in a manner consistent with the Constitution.

In making this assessment, the President should presume that an unconstitutional provision is severable. The usual rule, therefore, is that unconstitutional statutory provisions "may be disregarded while full effect will be given to such as are not repugnant to the [C]onstitution of the United States." *Bank of Hamilton v. Dudley's Lessee*, 27 U.S. (2 Pet.) 492, 526 (1829) (Marshall, C.J., for the Court); *see also Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). This rule gives force to the separation of powers by presuming that Congress would have wanted "[t]he sound part of it [to] be executed," even when "the vicious portion of it" is discarded. *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469 (1860).

At the same time, the President's Take Care Clause obligations may require him to refuse to enforce an entire section or statute, even if only part of it is noxious. The presumption of severability is overcome either where a statute is not "capable of functioning independently" without the unconstitutional provisions, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020) (opinion of Roberts, C.J.), or where the statute would not "function in a *manner* consistent with the intent of Congress," *Alaska Airlines*, 480 U.S. at 685 (emphasis in original). "Some delegations of power to the Executive" may be rendered "so broad" after severing unconstitutional eligibility criteria "that Congress would have been unwilling to make the delegation" absent the severed criteria. *Id.* at 685. After all, we generally presume that Congress does not intend to delegate away its powers over issues of significant social and economic importance, *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023), and thus that Congress rarely intends to confer unfettered discretion on the President without sufficient criteria to guide him.

To understand how the inquiry proceeds, compare our decision in *Tenure Protection* with the Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018). In *Tenure Protection*, we found that statutory tenure protections for the Commissioner of the Social Security Administration

("SSA") were unconstitutional. *See* 45 Op. O.L.C. at *15. But we concluded that the tenure protections were severable from the rest of the statute. *See id.* We noted that subjecting the SSA Commissioner to Presidential removal "would not impair the structure or functioning of any other provision of the statute, since none of those provisions depend[] upon the Commissioner's statutory protection from removal." *Id.* at *16. By contrast, in *NCAA*, the Supreme Court held unconstitutional a statutory provision that barred states from authorizing sports gambling. 584 U.S. at 458, 476–77. The Court found that bar inseverable from a prohibition on advertising sports gambling because it would make no sense to "forbid the advertising of an activity that is legal under both federal and state law." *Id.* at 485.[9]

We therefore undertake the severability inquiry mindful of the separation-of-powers considerations inherent to such a task. It is often the case that "Congress would prefer that we use a scalpel rather than a bulldozer in curing [any] constitutional defect[s] we identify." *Seila Law*, 140 S. Ct. at 2210–11 (opinion of Roberts, C.J.). The presumption favoring severability, as we have explained, manifests "respect for Congress's legislative role" by not "unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (opinion of Kavanaugh, J.). But we also "cannot re-write Congress's work" because such "'editorial freedom . . . belongs to the Legislature.'" *Seila Law*, 140 S. Ct. at 2211 (opinion of Roberts, C.J.) (alteration in original) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010)). "[U]ncritical severance" may sometimes "assume[] the legislative function" in "a more extreme" fashion than simply declining to give effect to "the whole statute and allowing Congress to address the conditions that pertained when the statute was considered at the outset." *Nat'l Fed'n of*

---

[9] We acknowledge that the Court has fractured in recent years with respect to the proper severability methodology. *Compare*, *e.g.*, *Seila Law*, 140 S. Ct. at 2207–11 (opinion of Roberts, C.J.), *and Barr*, 140 S. Ct. at 2348–56 (opinion of Kavanaugh, J.), *with Seila Law*, 140 S. Ct. at 2219–24 (Thomas, J., concurring in part and dissenting in part), *and Barr*, 140 S. Ct. at 2365–66 (Gorsuch, J., concurring in judgment in part and dissenting in part). We do not revisit today our own precedents on severability, which have long followed the familiar, two-part function-and-intent inquiry. *See, e.g.*, *Tenure Protection*, 45 Op. O.L.C. at *15–17; *Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 131 (2011).

*Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

### III.

With these constitutional and interpretative principles in mind, we now consider several programs created by Congress and administered by the Department of Education. These include programs relating to: (A) Hispanic-Serving Institutions ("HSI"); (B) Alaskan Native and Native Hawaiian-Serving Institutions ("ANNHSI"); (C) Native American-Serving Non-Tribal Institutions ("NASNTI"); (D) Asian American and Native American Pacific Islander-Serving Institutions ("AANAPISI"); (E) Native Hawaiian Career and Technical Education ("NHCTE"); (F) Predominantly Black Institutions ("PBI"); (G) Minority Science and Engineering Improvement ("MSEI"); (H) The Ronald E. McNair Postbaccalaureate Achievement Program; (I) Student Support Services; and (J) the race-based limitation on access to data from the Free Application for Federal Student Aid ("FAFSA").[10]

We apply the traditional tools of statutory interpretation to assess these programs. When "choosing between competing plausible interpretations of a statutory text," *Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, *10 (June 21, 2025) ("*Eluding Inspection*") (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)), we attempt to "interpret statutes so as to avoid constitutional questions where possible," *Section 235A of the Immigration and Nationality Act*, 24 Op. O.L.C. 276, 282 n.10 (2000). But sometimes a constitutional collision is unavoidable, and a determination of unconstitutionality "is forced upon [us] by language altogether unambiguous." *Eluding Inspection*, 49 Op. O.L.C. at *11 (quoting *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 76 (1838)).

That collision is unavoidable here. The text of the HSI, ANNHSI, NASNTI, AANAPISI, NHCTE, and formula-based PBI programs defines their beneficiaries in a manner that is plainly unconstitutional. The unconstitutional portions of these programs are inseverable from their surround-

---

[10] We were not asked to, and therefore do not, opine on programs involving Historically Black Colleges and Universities ("HBCUs") or Tribally Controlled Colleges and Universities.

ing statutory schemes. We also conclude that limiting FAFSA data access for race-based purposes is unconstitutional. By contrast, we find that the competitive PBI, MSEI, McNair, and Student Support Services programs are constitutionally administrable and that the Department may expend funds appropriated for these programs consistent with this opinion.

## A.

## Hispanic-Serving Institutions

The Secretary of Education is authorized by statute to make grants to "Hispanic-serving institutions of higher education to assist the institutions to plan, develop, undertake, and carry out programs to improve and expand the institutions' capacity to serve Hispanic students and other low-income students." 20 U.S.C. § 1101b(a). To qualify as an HSI, an institution must have "an enrollment of undergraduate full-time equivalent students that is at least 25 percent Hispanic students at the end of the award year." *Id.* § 1101a(a)(5)(B). The statute does not further define the word "Hispanic."

The Department administers three grant programs that are available only to HSIs: Developing Hispanic-Serving Institutions ("DHSI"), Promoting Postbaccalaureate Opportunities for Hispanic Americans ("PPOHA"), and Hispanic-Serving Institutions—Science, Technology, Engineering, or Mathematics and Articulation Programs ("HSI STEM"). This Office has previously advised Congress and the Department of Education that these programs violate the Fifth Amendment's equal-protection component.[11] We now memorialize the basis for that advice and explain why the unconstitutional elements are inseverable from the rest of the HSI scheme.

## 1.

We start, as always, with the language of the statute—here, the relevant text creates three HSI programs.

---

[11] Consistent with the advice of our Office and the following analysis, the Department of Justice has informed Congress that it will not defend the constitutionality of the DHSI program in litigation. *See* Letter for Mike Johnson, Speaker, U.S. House of Representatives, from D. John Sauer, Solicitor General, *Re:* State of Tennessee v. U.S. Department of Education*, No. 25-cv-270 (E.D. Tenn.)* (July 25, 2025).

*First*, "[t]he DHSI grant program provides grants to HSIs to expand educational opportunities for, and improve the attainment of, Hispanic students or low-income students of any race." Department of Education Memo at 3. The program was created in 1992, *see* Pub. L. No. 102-325, § 302(d), 106 Stat. 448, 472–74, and later moved to its own title in 1998, *see* Pub. L. No. 105-244, § 501, 112 Stat. 1581, 1765–74. Only HSIs are eligible for participation in the program. *See* 20 U.S.C. § 1101(c).

The stated purpose of the program was to "expand educational opportunities for, and improve the academic attainment of, Hispanic students" and to "expand and enhance the academic offerings, program quality, and institutional stability of colleges and universities that are educating the majority of Hispanic college students." *Id.* § 1101(b). And Congress justified its action based on generalized findings that "Hispanic Americans are at high risk of not enrolling or graduating from institutions of higher education," that disparities exist "between the enrollment of non-Hispanic white students and Hispanic students in postsecondary education," and that "Hispanic-serving institutions are underfunded" as compared to "other institutions of higher education." Pub. L. No. 105-244, § 501, 112 Stat. at 1765–66 (codified at 20 U.S.C. § 1101(a)(1)–(2), (4)). Congress has not revised those findings since they were first made in 1998.

*Second*, Congress created PPOHA in 2008. *See* Pub. L. No. 110-315, § 502(a), 112 Stat. 3078, 3331. Again, only HSIs are eligible to receive funds. *See* 20 U.S.C. § 1102a(b)(1). Congress did not make any findings relevant to this program, but it did express that the program was designed:

> (1) to expand postbaccalaureate educational opportunities for, and improve the academic attainment of, Hispanic students; and

> (2) to expand the postbaccalaureate academic offerings and enhance the program quality in the institutions of higher education that are educating the majority of Hispanic college students and helping large numbers of Hispanic and low-income students complete postsecondary degrees.

*Id.* § 1102.

*Third*, Congress created "[t]he HSI STEM grant program" in 2007 to give "priority to applications that meet the requirements of the DHSI program and are intended to (1) increase the number of Hispanic and

other low-income students attaining degrees in the fields of science, technology, engineering, or mathematics; and (2) to develop model transfer and articulation agreements between two-year and four-year institutions in such fields." Department of Education Memo at 3; *see also* 20 U.S.C. §§ 1101(b), 1067q(b)(2)(B); Pub. L. No. 110-84, § 802, 121 Stat. 784, 817–22 (2007); Pub. L. No. 110-315, § 316, 122 Stat. at 3185 (2008 redesignation). Only HSIs are eligible for this program. *See* 20 U.S.C. §§ 1101(b), 1067q(b)(2)(B).

Congress made no findings specific to this program either. In the broader subchapter in which the program is codified, Congress did make some generalized findings about minority students and minority-serving institutions, *see id.* § 1051(a), and it provided that the "purpose of this subchapter [is] to assist such institutions in equalizing educational opportunity through a program of Federal assistance," *id.* § 1051(b). Hispanic students are not mentioned in these general findings or statement of purpose.

## 2.

Each of these three grant programs is subject to strict scrutiny because each distributes government benefits based on race by distinguishing between educational institutions based on the racial composition of their student bodies. If that conclusion were not obvious from Congress's mere designation of "Hispanic-serving institutions," it becomes inescapable considering the quota-based definition of HSIs that Congress provided. *See id.* §§ 1101a(a)(5)(B), 1101b(a). None of the three HSI programs can pass either prong of strict scrutiny.

*First*, none of the HSI programs administered by the Department serves a compelling interest. That is especially clear post-*SFFA*. To start, when Congress bothered to make findings, it did not point to "specific, identified instances of past discrimination." *SFFA*, 143 S. Ct. at 2162. It made no findings about concrete episodes of discrimination against Hispanic students (i) in education, with respect to the DHSI program; (ii) in post-baccalaureate education, with respect to the PPHOA program; or (iii) in STEM, with respect to the HSI STEM program. Instead, the findings reference a regrettable disparity in graduation rates and postsecondary opportunities for Hispanic students. But "[s]tatistical disparities don't cut it." *Vitolo*, 999 F.3d at 361. Even if Congress had targeted a specific

episode of past discrimination, there is no suggestion—much less a finding—that the discrimination "violated the Constitution or a statute." *SFFA*, 143 S. Ct. at 2162. Nor did Congress make findings about forms of *de jure* discrimination in the educational context. *Cf. Skrmetti*, 145 S. Ct. at 1854 (Barrett, J., concurring) ("The distinction between *de jure* discrimination and private animus is consistent with the Fourteenth Amendment's text and purpose."). To be sure, Congress focused on the relevant industry: education. But "[a] generalized assertion of past discrimination in a particular industry . . . is not adequate" without a more concrete reference to specific episodes of discrimination. *Shaw*, 517 U.S. at 909.

*Second*, the programs are based on what amounts to a racial enrollment quota, which is incompatible with narrow tailoring. *Grutter*, 539 U.S. at 334. Institutions are effectively required to maintain a minimum of 25 percent Hispanic-student enrollment as a condition of eligibility under the program. *See* 20 U.S.C. § 1101a(a)(5). Almost two decades before *SFFA*, the Supreme Court held that the use of such quotas is necessarily not narrowly tailored. *See Grutter*, 539 U.S. at 334. Beyond the use of racial quotas, the programs employ—and indeed depend on—the "arbitrary [and] undefined" racial category "Hispanic." *SFFA*, 143 S. Ct. at 2167 (citing Mark Hugo Lopez, Jens Manuel Krogstad & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sept. 15, 2022), https://perma.cc/2SPP-3BXA). And the programs allocate zero-sum benefits—namely, limited amounts of appropriated funds—according to race, so they impermissibly use race as a negative factor. *See id.* at 2169.

One counterargument is that once an HSI receives federal monies, most students enrolled at the institution benefit—regardless of whether they are Hispanic. *See, e.g.*, 20 U.S.C. § 1101b(b) (listing the purposes for which a grant from these programs may be used). In some ways, this might mitigate the burden saddled on non-Hispanic students. But it cannot be divorced from a considerable under-inclusion problem—namely, that Hispanic students not enrolled at an HSI receive no benefits from the program whatsoever. Given the "mismatch between the means" Congress used "and the goals" it sought, *SFFA*, 143 S. Ct. at 2168, these programs are not narrowly tailored.

We therefore conclude that the race- and ethnic-conscious portions of these programs cannot be administered consistent with the Constitution.

### 3.

We now consider whether the unconstitutional portions of each program may be severed. In this instance, the HSI programs—along with most of the programs that you have asked us to review—were enacted as amendments to the Higher Education Act of 1965 ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219. The HEA and its many amendments contain hundreds of pages of provisions unrelated to any of the race-based grant programs at issue here. The race-based grant programs "operate independently from the other parts of the HEA," and "[t]here will be no impact" on the other provisions of the HEA if the present grant programs are unconstitutional. Department of Education Memo at 5. So nothing in this opinion casts doubt on the validity of the other sections of the HEA or its amendments. We instead focus on a narrower question of severability: whether the race-based components of each program are severable from the rest of the program at issue.

In our view, the ethnic classifications are inseverable from the other components of each HSI program. Ethnicity is "intrinsic in the program design." *Id.* The statute contains eligibility criteria for institutions that classify along ethnic lines, and the purposes for which the funds may be spent in large part turn on ethnicity.

We have considered the argument that "[w]hen the constitutional violation is unequal treatment," the Supreme Court's severability precedents favor "extend[ing] the relevant statutory benefits or burdens to those previously exempted, rather than nullifying the benefits or burdens for all." *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2354 (opinion of Kavanaugh, J.). Here, it might be logistically possible to sever the definition of HSIs and provide grants to any educational institution of higher education, with the direction that monies be used to "improve and expand the institutions' capacity to serve Hispanic students." 20 U.S.C. § 1101b(a). But because Congress failed to make the findings necessary to establish a compelling interest, those ethnicity-based portions of the programs—even beyond the definition of HSI—are unconstitutional too.

We acknowledge that some aspects of the programs are ethnicity neutral. The DHSI program, for instance, provides grants to HSIs to improve educational opportunities of "Hispanic students" and "low-income students of any race." Department of Education Memo at 3. But even if it

were logistically possible to administer the program in an ethnicity-neutral way, the statute would not then "function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685 (emphasis in original). Ethnicity is so intertwined with the programs' designs that were we to find the ethnic criteria severable, we would have in effect created programs entirely alien to the goals Congress set out to accomplish in the text of its enactments.

We also do not think Congress provided sufficiently meaningful ethnicity-neutral criteria to guide the Executive's distribution of one hundred million dollars: An undefined reference to "low-income students" is too thin a reed upon which to base meaningful eligibility criteria for the program. Once all ethnicity-based elements of the HSI programs are excised, there are no sufficient criteria remaining to identify or distinguish between beneficiaries. We see no evidence that Congress would have intended the Department to exercise such unfettered discretion to disburse funds. The DHSI, PPOHA, and HSI STEM programs are thus invalid in their entirety. The Take Care Clause does not countenance the President's execution of such a radically different law than the one enacted by the Legislature.

### B.

### Alaskan Native and Native Hawaiian-Serving Institutions

The ANNHSI program was created in 1998 and "provide[s] grants and related assistance to eligible Alaska Native-serving institutions and Native Hawaiian-serving institutions of higher education to enable such institutions to improve and expand their capacity to serve Alaska Natives and Native Hawaiians." Department of Education Memo at 6; *see also* 20 U.S.C. § 1059d; Pub. L. No. 105-244, § 303, 112 Stat. at 1641–42. These grants are funded through the HEA. *See* 20 U.S.C. § 1067q(b)(2)(D).

An Alaska Native is defined by the ANNHSI program as "a citizen of the United States who is a person of one-fourth degree or more Alaska Indian . . . Eskimo, or Aleut blood, or combination thereof." 43 U.S.C. § 1602(b); *see also* 20 U.S.C. §§ 1059d(b)(1), 7546(1). The term also "includes, in the absence of proof of a minimum blood quantum, any citizen of the United States who is regarded as an Alaska Native by the

Native village or Native group of which he claims to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any village or group." 43 U.S.C. § 1602(b). And an Alaska Native-serving institution must have a student body of "at least 20 percent Alaska Native students." 20 U.S.C. § 1059d(b)(2)(B). A Native Hawaiian must be "a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii." *Id.* § 7517(2)(B); *id.* § 1059d(b)(3). A Native Hawaiian-serving institution must have a student body of "at least 10 percent Native Hawaiian students." *Id.* § 1059d(b)(4)(B).

As with the HSI programs, Congress made broad and generalized findings about minority students and minority-serving institutions relating to the ANNHSI program, *see* 20 U.S.C. § 1051(a), and it provided that the "purpose of this subchapter [is] to assist such institutions in equalizing educational opportunity through a program of Federal assistance," *id.* § 1051(b). But Congress made no findings specific to Native Alaskans or Native Hawaiians.

For many of the same reasons as with the HSI programs, we conclude that the ethnicity-based elements of the ANNHSI program violate the Fifth Amendment and that they are inseverable from the rest of the program.

*First*, strict scrutiny applies because the ANNHSI program relies on racial and ethnic classifications rather than political classifications, and its stated purposes are unrelated to uniquely Indian interests. The statute defines both Alaska Native and Native Hawaiian not just by affiliation with a recognized political group—whether it be a federally recognized tribe or village—but also by blood quantum and ethnic ancestry. *Cf. Rice*, 528 U.S. at 514–15; Letter for Sen. Daniel K. Inouye, Chairman, Senate Committee on Indian Affairs, from Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, *Re: S. 1210, Native American Housing Assistance and Self-Determination Reauthorization Act of 2002* (Sept. 11, 2002). The statute thus distinguishes between people on the basis of race.[12]

---

[12] The statute does also reference Native villages, *see* 43 U.S.C. § 1602(b), but it does not limit eligibility for the ANNHSI program by affiliation with those entities. We discuss the implications of that definition further in the severability section.

Even if these classifications were political rather than racial, they do not "relate[] to distinct federal obligations to Indians." *Cohen's* § 17.03[2][b][ii]. The ANNHSI grant program is ostensibly designed to remediate the underrepresentation of certain groups in education. But underrepresentation of Native individuals, though lamentable, is hardly a "uniquely Indian" phenomenon. "With respect to these matters, Indians stand on no different footing than do other minorities in our pluralistic society." *Peyote Exemption*, 5 Op. O.L.C. at 420. Nor does such underrepresentation implicate Congress's enumerated powers to legislate with respect to the Indian tribes. *See Williams*, 115 F.3d at 665.

To be clear, other educational programs not considered here could be related to Indian interests. After all, many Indian treaties since the Founding have contained provisions dealing with education. *See* Melody L. McCoy, Native Am. Rts. Fund, *The Evolution of Tribal Sovereignty Over Education in Federal Law Since 1965* at 6 (2005), https://perma.cc/ EV6F-GWMY. An education program involving uniquely Indian interests—perhaps based in treaty rights or tribal self-determination—would be more likely to be reviewed under the more lenient *Mancari* standard. But the ANNHSI program here addresses the underrepresentation of Native students in education to promote generalized diversity interests, not distinctively Indian interests. And as we have explained, race-based preferences are not the only way to address educational interests involving Native Americans. The United States can—and does—discharge its trust obligations through race-neutral laws and regulations. *See Gros Ventre Tribe*, 469 F.3d at 810; *cf. SFFA*, 143 S. Ct. at 2206 (Thomas, J., concurring) ("Race-neutral policies may thus achieve the same benefits of racial harmony and equality without any of the burdens and strife generated by affirmative action policies."). But the ANNHSI program targets only the underrepresentation of specific ethnic groups, so Congress's power to legislate is at its lowest ebb, *see SFFA*, 143 S. Ct. at 2170–73, and the program's racial or ethnic classifications are subject to strict scrutiny.

The program fails strict scrutiny because Congress did not make any findings identifying specific episodes of past discrimination that violated the Constitution or a statute, nor any instances of discrimination in the law, especially as it relates to Alaskan and Hawaiian Natives. *See* Department of Education Memo at 7; *Skrmetti*, 145 S. Ct. at 1854

24

(Barrett, J., concurring). Moreover, the program effectively employs a racial quota by limiting institutional eligibility to schools with a certain racial composition, creating "incentives to achieve a numerical number of Native Hawaiian or Native Alaskan students in order to unlock access to federal funds under these programs." Department of Education Memo at 7. The ANNHSI program further suffers the under-inclusion problem we noted with respect to the HSI programs, insofar as it excludes institutions that may well be willing and able to serve Alaska Natives and Native Hawaiians.

*Second*, the race-based portions of the ANNHSI program are not severable from the rest of the program. As with the HSI programs, the ethnic criteria "is intrinsic in the program design." *Id.* Administering this program in a race-neutral way would nullify its central purpose, and there are no sufficient race-neutral criteria to identify or distinguish between beneficiaries. In other words, even if it would be logistically possible to administer the program without considering race, doing so would frustrate the way Congress intended this program to operate.

We considered whether it would be possible to sever portions of the Alaska Native definition to limit its reach to those affiliated with a Native village. *See* 43 U.S.C. § 1602(b). But the text demonstrates Congress's intent that "proof of a minimum blood quantum" would be the controlling basis for preferential treatment, if such proof existed. *Id.* And even if the definition of Alaska Native could be cabined to only those affiliated with a federally recognized Native village, the ANNHSI program does not involve uniquely Native interests for the reasons we have described above. So retaining even part of the definition of Alaska Native would not cure the program's constitutional defect. The racial classifications are thus inseverable from the ANNHSI program.

## C.

### Native American-Serving Non-Tribal Institutions

Enacted in 2008 as part of the HEA, the NASNTI program "provides grants and related assistance to eligible [institutions of higher education] that are not Tribal Colleges or Universities, with the goal of improving and expanding their capacity to serve Native American and low-income

students." Department of Education Memo at 7; *see also* 20 U.S.C. § 1059f(a); Pub. L. No. 110-315, § 306, 122 Stat. at 3173.

The statute defines "Native American" as "an individual who is of a tribe, people, or culture that is indigenous to the United States." 20 U.S.C. § 1059f(b)(1); *see also id.* § 1067q(c)(6) (same). A "Native American-serving, nontribal institution" must have "an enrollment of undergraduate students that is not less than 10 percent Native American students," and must not be a "Tribal College or University." *Id.* § 1059f(b)(2)(B)–(C); *id.* § 1067q(c)(8) (same); *see also id.* § 1059c(b)(3) (defining "Tribal College or University"). As above, Congress made general findings about minority students but did not specifically mention Native American students or institutions. *See id.* § 1051(a). And as above, we believe that the program's race- and ethnicity-based provisions are unconstitutional and inseverable.

The NASNTI program is subject to strict scrutiny because it contains racial and ethnic classifications rather than political classifications based on tribal affiliation and uniquely Indian interests.

The program's definition of "Native American" sweeps much more broadly than federally recognized tribal affiliation. *See id.* § 1059f(b)(1). As a result, it is far closer to the ethnic-ancestry classification that *Rice* recognized as a proxy for race, 528 U.S. at 514–17, than it is to the political definition in *Mancari* that "exclude[d] many individuals who are racially . . . classified as 'Indians,'" 417 U.S. at 553 n.24. Perhaps even more importantly, the program does not implicate any uniquely Indian interests because it benefits only "nontribal" institutions, 20 U.S.C. § 1059f(a)—a phrase defined here in juxtaposition to "a Tribal College or University," *id.* § 1059f(b)(2)(C). The NASNTI program fails strict scrutiny for the same reasons as both the HSI and ANNHSI programs—the most important reason being that Congress did not make any findings about specific episodes of discrimination against Native American students in educational settings that violated the Constitution or a statute, nor did it make findings about *de jure* discrimination in the relevant industry.

As with other programs we have considered, the race- and ethnicity-based elements of the NASNTI program cannot be severed. The Department informs us that doing so would "leave the program[] inoperable." Department of Education Memo at 9. The central purpose of this program is to benefit Native American students and the nontribal institutions where they enroll. Without the race-based elements of the program, there are no

sufficient race-neutral criteria to identify or distinguish between beneficiaries. *See* 20 U.S.C. § 1059f(a).

### D.

### Asian American and Native American Pacific Islander-Serving Institutions

Also created in 2008 as part of the HEA, the AANAPISI program provides grants and related assistance aimed at enabling Asian American and Native American Pacific Islander-Serving institutions "to improve and expand their capacity to serve Asian Americans and Native American Pacific Islanders and low-income individuals." *See* 20 U.S.C. § 1059g(a); *id.* § 1067q(a)(6), (b)(2)(D)(iii), (c)(1)–(2); *see also* Pub. L. No. 110-315, § 307, 122 Stat. at 3175. The program is unconstitutional and inseverable for the same reasons as the previous programs.

*First*, Congress again defined the statute's operative terms through racial or ethnic categories. The term "Asian American" means "[a] person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam." Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58,782, 58,789 (Oct. 30, 1997); *see also* 20 U.S.C. § 1059g(b)(1) (same); *id.* § 1067q(c)(1) (same). "The term 'Native American Pacific Islander' means any descendant of the aboriginal people of any island in the Pacific Ocean that is a territory or possession of the United States." 20 U.S.C. § 1059g(b)(3); *see also id.* § 1067q(c)(7) (same). There are no federally recognized Indian tribes in the Pacific islands. "The term 'Asian American and Native American Pacific Islander-serving institution' means an institution of higher education that . . . , at the time of application, has an enrollment of undergraduate students that is not less than 10 percent students who are Asian American or Native American Pacific Islander." *Id.* § 1059g(b)(2); *see also* § 1067q(c)(2) (same). And again, Congress did not make findings specific to Asian American and Native American Pacific Islander students. *See* 20 U.S.C. § 1051(a).

While the statutory definition of "Asian American" could be read to turn on national origin rather than race, that does not affect the legal standard

applicable here—distinctions on the basis of national origin are also subject to strict scrutiny. *See Skrmetti*, 145 S. Ct. at 1828 ("For example, laws that classify on the basis of race, alienage, or national origin trigger strict scrutiny.").

*Second*, the program fails strict scrutiny. Most pertinently, Congress made no findings about specific episodes of past discrimination against Asian American and Native American Pacific Islander students in the education context that violated the Constitution or a statute. Nor did it make findings about discrimination in the law. And for substantially the same reasons we have already explained in the context of the programs discussed above, the AANAPISI program is not narrowly tailored.

*Third*, these unconstitutional elements cannot be severed from the rest of the AANAPISI program. The use of race-based classifications is so interwoven into the design of the program that to allow it to operate in a race-neutral manner would be to fundamentally alter the way that Congress intended this program to operate. Moreover, the grant program is designed to benefit members of specific racial or ethnic groups; without those race-based elements, the Department lacks sufficient criteria to guide the distribution of funds. This, too, Congress could not have intended.

## E.

### Native Hawaiian Career and Technical Education

The NHCTE program "requires the Department to provide grants to community-based organizations primarily serving and representing Native Hawaiians to provide career and technical education programs for Native Hawaiian Students." Department of Education Memo at 19. Unlike the other programs we have considered, Congress created this program through the Carl D. Perkins Career and Technical Education Act of 2006, Pub. L. No. 109-270, § 1(b), 120 Stat. 683, 707 ("Perkins V"). Perkins V created other programs that are race neutral. For example, it provided for grants to the "outlying areas" of Guam, American Samoa, the Northern Mariana Islands, and the Republic of Palau. *See id.* at 706–07. It also authorized "State leadership activities," including programs to develop, improve, and expand "the use of technology in career and technical education." *Id.* at 723–74.

NHCTE was not one of those race-neutral programs: The Secretary "award[s] grants to or enter[s] into contracts with community-based organizations primarily serving and representing Native Hawaiians to plan, conduct, and administer programs, or portions thereof . . . for the benefit of Native Hawaiians." 20 U.S.C. § 2326(h). "Native Hawaiian" means "any individual any of whose ancestors were natives, prior to 1778, of the area which now comprises the State of Hawaii." *Id.* § 2326(a)(3). Although the operative text describing the program in subsection (h) does not use the exact phrase "Native Hawaiian community-based organization," its elements are central to the description given, and that phrase is defined in subsection (a) to refer to "any organization that is composed primarily of Native Hawaiians from a specific community and that assists in the social, cultural, and educational development of Native Hawaiians in that community." *Id.* § 7517(3); *see also id.* § 2326(a)(4).

In Perkins V, Congress did no more to establish a record to justify its use of racial classifications than it did for the programs covered by the previous analysis. Indeed, it made no findings relevant to the NHCTE program specifically. For the reasons discussed in Part III.B, the race classifications that undergird NHCTE fail strict scrutiny, including because Congress made no findings about specific instances of past discrimination against Native Hawaiian students in education that violated the Constitution or a statute. And for similar reasons as discussed previously, those race-based portions of section 2326(h) are also inseverable from the rest of the program contained in that subsection. But the NHCTE program is severable from the remainder of the programs authorized by section 2326, which function independently.[13]

## F.

## Predominantly Black Institutions Programs

The Department of Education administers two grant programs for PBIs. Under both programs, an institution is considered a PBI only if its student body is at least 40 percent black American students, among other requirements. *See* 20 U.S.C. § 1059e(b)(1)(C) (formula grants); *id.*

---

[13] We were not asked to, and we therefore do not, opine on the constitutionality of the other programs authorized by 20 U.S.C. § 2326.

§ 1067q(c)(9)(C)(i) (competitive grants). To be designated as a PBI, an institution cannot also be an HBCU or HSI. *See id.* §§ 1059e(i), 1067q(c)(9)(F).

The first program, created in 2008 as part of the HEA, involves formula grants, under which any otherwise-eligible PBI may receive monies if it meets certain formulaic criteria. *See* Pub. L. No. 110-315, § 305(a), 122 Stat. at 3169–73; *see also* Pub. L. No. 110-84, § 802, 121 Stat. at 817–20 (authorizing grants to PBIs, among other institutions). This program helps "eligible institutions to plan, develop, undertake and implement programs to enhance the institution's capacity to serve more low- and middle-income Black American students," "expand higher education opportunities for eligible students by encouraging college preparation and student persistence in secondary school and postsecondary education," and "strengthen the financial ability of the institution to serve the academic needs of these students." Department of Education Memo at 12–13; *see also* 20 U.S.C. § 1059e(c), (e). Formula grants given to PBIs must be used, among other aims, "to assist the [PBI] to plan, develop, undertake, and implement programs to enhance the institution's capacity to serve more low- and middle-income Black American students." 20 U.S.C. § 1059e(d)(1)(A).

The second program, created in 2007, involves competitive grants. PBIs submit proposals for grant monies to establish or strengthen programs in the following areas: "science, technology, engineering, or mathematics (STEM);" "health education;" "internationalization or globalization;" "teacher preparation;" or "improving educational outcomes of African American males." *Id.* § 1067q(a)(5), (b)(2)(C)(ii). The Secretary then chooses from among the competitive applicants the PBIs to which grants will be awarded.

Congress did not make findings specific to either program. The 2008 formula-grant program is subject to the generalized findings about the importance of minority-serving institutions in 20 U.S.C. § 1051. The competitive-grant program's creation in 2007 was accompanied by a declaration that "there is a particular national interest in aiding those institutions of higher education that have historically served students who have been denied access to postsecondary education because of race or national origin and whose participation in the American system of higher education is in the Nation's interest so that equality of access and quality of postsecondary education opportunities may be enhanced for all stu-

dents." *Id.* § 1051(a)(8). The stated purpose of both programs is "to assist such institutions in equalizing educational opportunity through a program of Federal assistance." *Id.* § 1051(b).

We conclude that the race-based provisions of both PBI programs are unconstitutional. But while the unconstitutional elements of the PBI formula program are inseverable, we conclude that those elements can be severed from the remainder of the competitive program.

## 1.

For the reasons described at length above, both PBI programs are subject to—and fail—strict scrutiny. They are based on express race-based classifications. *See* 20 U.S.C. §§ 1059e(b)(1)(C), 1067q(c)(9)(C)(i). And there is no compelling interest to support that classification. Congress made no factual findings about the existence of specific episodes of discrimination that violated the Constitution or a statute. *See, e.g.*, *id.* § 1051. One might be tempted to suggest that such findings are unnecessary given the well-documented history of racial discrimination against black Americans in higher education, which led to the affirmative action plans in the first place. But the Supreme Court has long said that it is insufficient simply to assert "inherently unmeasurable claims of past wrongs," *Croson*, 488 U.S. at 505–06, or "generalized assertion[s] of past discrimination in a particular industry," *Shaw*, 517 U.S. at 909. Especially after *SFFA*, the compelling-interest test requires more of laws that allocate benefits based on race. 143 S. Ct. at 2162.

Neither are the programs narrowly tailored. Both use naked racial quotas, as only institutions with a minimum composition of black students are eligible—even though other institutions also serve low- and middle-income black American students. The grants are thus allocated based on an inflexible, predetermined formula, without regard to the specific historical instances of discrimination at each institution. The program further allocates zero-sum benefits (again, limited amounts of appropriated money) according to race, using race as a negative factor. *See id.* at 2169.

## 2.

The PBI formula-grant program is inextricably intertwined with its race-based elements. We agree with the Department that "it would not make sense to have a program for predominantly Black institutions that

do not serve Black students." Department of Education Memo at 14. The express purpose of the program is "to assist Predominantly Black Institutions in expanding educational opportunity through a program of Federal assistance." 20 U.S.C. § 1059e(a). And in the "[r]equired activities" section of the statute, Congress made clear that the grants must "enhance the institution's capacity to serve more low- and middle-income Black American students." *Id.* § 1059e(d)(1)(A). Severing the race-based components of the PBI formula grants would render the program incapable of being administered in the manner Congress intended, and it would leave the Executive all but standardless in allocating associated funds.

The race-based provisions of the competitive-grant program, however, may be severed. Admittedly, this is a close question. Congress undoubtedly focused on institutional recipients serving black American students and thus unconstitutionally used race in a preferential manner. But it also provided comparatively more non-racial purposes to guide the Secretary's discretion in reviewing proposals and allocating grants. Those permissible and race-neutral purposes include the establishment and strengthening of STEM programs, health education, internationalization or globalization, and teacher preparation. *See id.* § 1067q(b)(2)(C)(ii)(I)–(IV). We think it plausible, as a matter of statutory interpretation, that Congress would have wanted to continue providing funds for such purposes even if the race-based specifications for the program were found unconstitutional. At the very least, the race-based provisions of this program are not so tangled with the rest of the program as to overcome the presumption in favor of severability. *See Free Enter. Fund*, 561 U.S. at 508; *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2351 (opinion of Kavanaugh, J.). Even after excising the race-based elements of the competitive program, there remain sufficient criteria to guide the Executive's faithful execution of this law.

In reaching this conclusion, we have considered that the statute contains a section header entitled "[i]nvestment in historically Black colleges and universities and other minority-serving institutions." 20 U.S.C. § 1067q. It is true that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 143 S. Ct. 1557, 1567 (2023) (quotation marks and citation omitted). But while a heading may be a clue that resolves doubt about "some ambiguous word or phrase," "the heading of a section cannot limit the plain meaning of the text" because "matters in the

text . . . are frequently unreflected in the headings." *Bhd. of R.R. Train-men v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("Although the section is titled 'Rejection of Referral,' the text sweeps more broad-ly . . . ."). More importantly, the interpreter is not focused on resolving doubts about ordinary meaning at the severability step of the analysis. Severability asks different questions: Is the statute "capable of function-ing independently" without the unconstitutional provisions? *Seila Law*, 140 S. Ct. at 2209–10 (opinion of Roberts, C.J.). And would it "function in a *manner* consistent with the intent of Congress"? *Alaska Airlines*, 480 U.S. at 685 (emphasis in original). For the reasons we have explained, the statutory title overcomes neither the broader statutory text here nor the presumption of severability.

The Department may therefore continue to provide competitive grants for any authorized use enumerated in 20 U.S.C. § 1067q(b)(2)(C)(ii)(I)–(IV), without regard to whether the grant recipient is a PBI. The Department may also promulgate new, race-neutral regulations to facilitate the distribution of monies under the program, but must neither (i) award grants to improve the educational outcomes of any particular racial or ethnic group, or (ii) prioritize or limit eligibility to institutions of a certain racial or ethnic composition.

## G.

### Minority Science and Engineering Improvement Program

The MSEI program "assists predominantly minority institutions in ef-fecting long-range improvement in science and engineering education programs and increasing the flow of underrepresented ethnic minorities, particularly minority women, into science and engineering careers." Department of Education Memo at 11; *see also* 20 U.S.C. § 1067a(b).

Institutions are eligible only if they are "minority institutions" or provide a "needed service" to one. *See* 20 U.S.C. § 1067g.[14] A "minori-

---

[14] Certain organizations are also eligible if they "provide a needed service to a group of minority institutions" or if they "provide in-service training for project directors, scien-tists, and engineers from minority institutions." 20 U.S.C. § 1067g(3); *see also id.* § 1067g(4).

ty institution" is "an institution of higher education whose enrollment of a single minority or a combination of minorities . . . exceeds 50 percent of the total enrollment." *Id.* § 1067k(3). "The term 'minority' means American Indian, Alaskan Native, Black (not of Hispanic origin), Hispanic (including persons of Mexican, Puerto Rican, Cuban, and Central or South American origin), Pacific Islander or other ethnic group underrepresented in science and engineering." *Id.* § 1067k(2). And a group "'underrepresented in science and engineering' means a minority group whose number of scientists and engineers per 10,000 population of that group is substantially below the comparable figure for scientists and engineers who are white and not of Hispanic origin." *Id.* § 1067k(5).

The program's origins trace back to the National Science Foundation Act of 1950, which directed the National Science Foundation ("NSF") "to develop and encourage the pursuit of a national policy for the promotion of basic research and education in the sciences," without any mention of minority institutions. Pub. L. No. 81-507, § 3(a)(1), 64 Stat. 149, 149. More than 20 years later, the NSF created the MSEI program by regulation. *See* NSF, ED210149, *Minority Institutions Science Improvement Program: A Brief History* 1 (1981). In 1979, Congress transferred NSF programming authority to the Department of Education. *See* Pub. L. No. 96-88, § 304(a)(1), 93 Stat. 668, 680. Once again, the statute did not mention minority institutions.

Congress first expressly blessed the MSEI program in 1986, *see* Pub. L. No. 99-498, § 1002, 100 Stat. 1268, 1561, and made its first findings in support of that program a decade later. Those findings provided:

> (1) It is incumbent on the Federal Government to support the technological and economic competitiveness of the United States by improving and expanding the scientific and technological capacity of the United States. More and better prepared scientists, engineers, and technical experts are needed to improve and expand such capacity.

> (2) As the Nation's population becomes more diverse, it is important that the educational and training needs of all Americans are met. Underrepresentation of minorities in science and technological fields diminishes our Nation's competitiveness by impairing the quantity of well prepared scientists, engineers, and technical experts in these fields.

(3) Despite significant limitations in resources, minority institutions provide an important educational opportunity for minority students, particularly in science and engineering fields. Aid to minority institutions is a good way to address the underrepresentation of minorities in science and technological fields.

(4) There is a strong Federal interest in improving science and engineering programs at minority institutions as such programs lag behind in program offerings and in student enrollment compared to such programs at other institutions of higher education.

Pub. L. No. 105-244, § 307(a), 112 Stat. at 1647 (codified as amended at 20 U.S.C. § 1067).

For many of the reasons discussed above, we conclude that this program, in its current race-preferential form, violates the Fifth Amendment. But we think that its race-based provisions are severable.

## 1.

The MSEI program is subject to strict scrutiny because it contains a facial classification on the basis of race and ethnicity. The statute defines "minority institution" by reference to the racial composition of an institution's student body. *See* 20 U.S.C. § 1067k(2)–(3). Even the definition's residual clause—the provision referring to "other ethnic group underrepresented in science and engineering," *id.* § 1067k(2)—refers expressly to ethnicity and is defined in contradistinction to individuals "who are white and not of Hispanic origin," *id.* § 1067k(5). By statutory definition, only white non-Hispanics are categorically excluded and can never be a "minority" or underrepresented ethnic group.

The program fails strict scrutiny. Unlike the programs discussed above, Congress made findings about the need for the MSEI program, but it referred only to the "[u]nderrepresentation of minorities in science and technological fields," *id.* § 1067, not to any specific episodes of past discrimination that violated the Constitution or a statute in those particular fields. With respect to narrow tailoring, the program fails for many reasons, not least because it employs a racial quota: Only institutions of a certain racial or ethnic composition may qualify for the grants.

That an institution may meet this quota through a mix of different racial groups is immaterial. Under the Minority Business Utilization Plan at

issue in *Croson*, for instance, the "Plan required prime contractors . . . to subcontract at least 30% of the dollar amount of the contract to one or more [MBEs]," where an MBE was a business at least 51 percent owned and controlled by "'Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts.'" 488 U.S. at 477–78 (citation omitted). The Court concluded that the "30% quota" was invalid, even though the Plan did not require a specific percentage of any one racial group. *Id.* at 499. So, too, here. Indeed, one alternative way to conceptualize the grant program is that no institution is eligible if its student body is composed of more white students than non-white students. The MSEI program is also noteworthy because it singles out one specific racial group—white non-Hispanics—for special disability by excluding that group from underrepresented status.

Finally, the MSEI program suffers from many of the same deficiencies as other programs we have considered. It deploys simplistic and overbroad classifications like "Hispanic" or "Black," while also presumptively excluding groups from Asian and Middle Eastern countries. Congress does not appear to have considered any race-neutral alternatives to achieve the same ends. And the program uses race as a negative by allocating zero-sum benefits to members of certain racial groups but not others.

### 2.

In our view, the race-based provisions of the MSEI program are severable from the remainder of the program. This is a close question, but close questions generally are resolved in favor of severability. *See Free Enter. Fund*, 561 U.S. at 508. And this is such a case.

Based on the statutory text and history, it appears that Congress would have preferred to retain a race-neutral grant program even without the race-based provisions. When the authority to create such a program was enacted in 1950, Congress made no mention of minority institutions. It instead wanted to encourage "a national policy for the promotion of basic research and education in the sciences." Pub. L. No. 81-507, § 3(a)(1), 64 Stat. at 149. The NSF established the race-based program, which Congress subsequently transferred (though not by name) to the Secretary. Even when Congress later made factual findings, many of those findings

were race neutral. One of Congress's goals was "to support the technological and economic competitiveness of the United States by improving and expanding the scientific and technological capacity of the United States." 20 U.S.C. § 1067(1). In Congress's view, increasing the quantity (and quality) of scientists was "needed to improve and expand such capacity." *Id.* The race-based provisions of the program reflected Congress's desire to increase "the quantity of well prepared scientists, engineers, and technical experts in these fields." *Id.* § 1067(2). But it is possible to increase "program offerings and . . . student enrollment" in STEM programs without resorting to racial classifications. *Id.* § 1067(4).

The list of authorized uses for grant monies illustrates the ways in which the program could still operate without resort to race-based preferences and demonstrates that the Executive's decision-making would still be guided by clear standards. *But see* Department of Education Memo at 12 ("To sever the statutory designation for MSEI from the programs would leave the programs inoperable."). Congress directed that MSEI grants may be used to improve "faculty development programs" and "development of curriculum materials," 20 U.S.C. § 1067c(b)(1); to "assist[] institutions in sharing facilities and personnel" and to "disseminat[e] information about established programs in science and engineering," *id.* § 1067c(b)(2)(A)–(B); and to fund "advanced science seminars," "science faculty workshops and conferences," "programs for visiting scientists," and the like, *id.* § 1067c(4). All these race-neutral purposes would contribute to the technological and economic competitiveness of the United States, as described in the congressional findings. *See id.* § 1067(1).

On the other hand, the 1986 Congress wanted the program to benefit "predominantly minority institutions" with the goal of "increas[ing] the participation of underrepresented ethnic minorities . . . in scientific and technological careers." *Id.* § 1067a(b). But as we have explained, this goal was not an end in and of itself. Neither was it essential to the program that Congress authorized in 1950. Instead, we understand the racial element of the program to have reflected Congress's judgment in 1986 about the most effective way to increase the quantity and quality of scientists and engineers. Mindful of the presumption in favor of severability, we conclude that the race-based element of the program is not inextricable from Congress's statutory design.

The Department may therefore continue to provide grants for any authorized use enumerated in 20 U.S.C. § 1067c(b), without regard to whether the recipient is a minority institution. The Department may also promulgate new, race-neutral regulations to facilitate the distribution of monies under the program, but it must not prioritize or limit eligibility to institutions of a certain racial or ethnic composition or give any weight to the racial or ethnic composition of recipient institutions when distributing awards.

## H.

The Ronald E. McNair Postbaccalaureate Achievement Program

Congress created several programs in 1992 to "identify qualified individuals from disadvantaged backgrounds, to prepare them for a program of postsecondary education, to provide support services for such students who are pursuing programs of postsecondary education, to motivate and prepare students for doctoral programs, and to train individuals serving or preparing for service" in such programs and projects so designed. Pub. L. No. 102-325, § 402(a), 106 Stat. at 482–83 (codified at 20 U.S.C. § 1070a-11(a)); *accord* Department of Education Memo at 16. Congress named one of those programs—the McNair program—for an astronaut who died in the 1986 Challenger Space Shuttle accident. *See* Pub. L. No. 102-325, § 402(a), 106 Stat. at 489 (codified at 20 U.S.C. § 1070a-15). The McNair program is "designed to provide disadvantaged college students with effective preparation for doctoral study," 20 U.S.C. § 1070a-15(a), by providing federal financial support to institutions of higher education for a range of projects relating to doctoral study, *id.* § 1070a-15(b); *see also id.* § 1070a-15(c) (listing additional permissible services).

When funding such projects, the Secretary is required to ensure that "not less than two-thirds" of participating students are "low-income individuals who are first generation college students." *Id.* § 1070a-15(d)(1). The Secretary is also obligated by statute to ensure "that the remaining persons participating in the project . . . be from a group that is underrepresented in graduate education," including "Alaska Natives," "Native Hawaiians," and "Native American Pacific Islanders." *Id.* § 1070a-15(d)(2). The statute does not limit "a group that is un-

derrepresented in graduate education" to those racial or ethnic categories, *id.*, but the Department's regulations go beyond the statute's terms into racial classification. Those regulations define "[g]roups underrepresented in graduate education" as "[t]he following ethnic and racial groups": "Black (non-Hispanic), Hispanic, American Indian, Alaskan Native, Native Hawaiians, and Native American Pacific Islanders." 34 C.F.R. § 647.7(b) (cross-references omitted). A student may also qualify if the group to which he or she belongs is "underrepresented in certain academic disciplines as documented by standard statistical references or other national survey data submitted to and accepted by the Secretary on a case-by-case basis." *Id.* § 647.3(c)(3).[15] And the Department's implementing regulations contain no relevant factual findings about these ethnic and racial classifications. *See* 59 Fed. Reg. 43,986, 43,986–90 (Aug. 25, 1994); 75 Fed. Reg. 65,712, 65,794–98 (Oct. 26, 2010); 79 Fed. Reg. 75,871, 76,103 (Dec. 19, 2014).

Like so many of the programs that we have considered in this opinion, Congress did not make specific factual findings about the McNair program. And like those other programs, we conclude that the program violates the Fifth Amendment—at least in part. Although the broader reference to "group[s] . . . underrepresented in graduate education" in section 1070a-15(d)(2) may be race neutral, we conclude that the designation of Native American groups in clauses (A) to (C) relies on racial classifications that fail strict scrutiny. But we find that list of Native American groups is severable from the rest of subparagraph (d)(2). With respect to the Department's regulations, we conclude that they are unconstitutional racial and ethnic classifications.

### 1.

Recall that the statute requires institutions of higher education to assure the Secretary "that not less than two-thirds of the individuals participating" will be "low-income individuals who are first generation college students." 20 U.S.C. § 1070a-15(d)(1). The Secretary must then further

---

[15] You have advised us that the Department has approved project participation for Caucasian, Southeast Asian, and female students underrepresented in various fields. But this does not change our analysis below, particularly because the program still imposes an additional burden on members of non-designated racial groups.

ensure "that the remaining persons participating in the project" will be "from a group that is underrepresented in graduate education," including "Alaska Natives," "Native Hawaiians," and "Native American Pacific Islanders." *Id.* § 1070a-15(d)(2). These latter classifications fail strict scrutiny, but are severable from the larger program.

### a.

Each of these statutory classifications is racial rather than political in character. An Alaska Native is defined by the statute as "a citizen of the United who is a person of one-fourth degree or more Alaska Indian . . . Eskimo, or Aleut blood, or combination thereof." 43 U.S.C. § 1602(b); *see also* 20 U.S.C. § 7546(1). "It also includes, in the absence of proof of a minimum blood quantum, any citizen of the United States who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member . . . ." 43 U.S.C. § 1602(b). For the reasons we have already described with respect to a materially identical definition, *see supra* Part III.B, this definition is a racial and ethnic classification rather than a political one, even though it references Alaska Native villages. A Native Hawaiian is required by the program to be "a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii." 20 U.S.C. § 7517(2)(B). We have likewise already explained why this definition also demands strict scrutiny. *See supra* Part III.B. Finally, "[t]he term 'Native American Pacific Islander' means any descendant of the aboriginal people of any island in the Pacific Ocean that is a territory or possession of the United States." 20 U.S.C. § 1059g(b)(3). This, too, is an ethnic and racial classification. *See supra* Part III.D.

Nothing about these definitions—much less anything about the McNair program itself—is justified as fulfilling Congress's unique obligations to Indians. The program, named for an extraordinary astronaut and physicist, addresses only the underrepresentation of groups in postsecondary education.[16] It does not involve Indian lands, treaties, political institutions, or

---

[16] McNair, an astronaut and physicist who became the second black American in space, was the son of an auto repairman and a schoolteacher. *See* Carl S. McNair with H. Michael Brewer, *In the Spirit of Ronald E. McNair, Astronaut: An American Hero* 17–18 (2005). He was raised in a rural, low-income household that lacked running water. *Id.*

the like. So we are convinced that strict scrutiny applies to the classifications in section 1070a-15(d)(2)(A)–(C), rather than *Mancari*'s rational-basis review.[17]

Applying strict scrutiny, no compelling interest supports these classifications. Congress never identified specific episodes of past discrimination against Alaska Natives, Native Hawaiians, or Native American Pacific Islanders in the preparation for doctoral studies, much less ones that violated the Constitution or a statute. Addressing underrepresentation in graduate programs—standing alone—is insufficient to constitute a compelling interest. *See SFFA*, 143 S. Ct. at 2162.

The classifications also fail narrow tailoring. They bear on as many as one third of the program's applicants. And while the classifications do not mandate any number or percentage of Alaska Natives, Native Hawaiians, or Native American Pacific Islanders, the scheme nevertheless allocates zero-sum benefits according to race in at least some cases.[18]

### b.

Like the MSEI program, however, the statute's Native American classifications are severable from the directive that up to one third of program participants be from groups that are underrepresented in education. Congress specified that up to one third of project participants must be from such a group, "including" Alaska Natives, Native Hawaiians, and Native American Pacific Islanders. *Id.* But the word "including" presumptively "introduces examples, not an exhaustive list." Antonin Scalia & Bryan A.

---

at 8. After receiving a Bachelor of Science degree in physics, he went on to earn a Ph.D. in physics from the Massachusetts Institute of Technology. *Id.* at 94, 103.

[17] The Department has suggested that these classifications might be "tribal affiliations." *See* Department of Education Memo at 17–18. But nothing in the statutory definitions refers to tribal affiliations, which underscores our conclusion that these preferences are based on Indian ethnicity rather than on the political status of membership in a federally recognized tribe.

[18] We can imagine scenarios in which the program might survive an as-applied challenge. The statutory classifications of Native American groups are relevant only when fewer than 100 percent of the participants qualified for the scholarship on the basis of being low-income and first generation. In some cases, then, the racial classifications may have no role to play at all in the selection of recipients. But in those instances where the racial classifications do play a role, they would fail strict scrutiny for lack of both a compelling interest and narrow tailoring.

Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012); *see also In re Vill. Apothecary, Inc.*, 45 F.4th 940, 947 (6th Cir. 2022) ("Although context matters, most courts read the word 'include' to introduce a nonexhaustive list." (citations omitted)). There may be many other race-neutral groups that are underrepresented in graduate education. For instance, it may be the case that students from certain states, including Alaska or Hawaii, are underrepresented in graduate education. Non-traditional students—such as parents or older individuals returning to education—may be underrepresented in graduate education. Members of rural communities may be underrepresented. And so on. The McNair program could continue to function well without the use of race-based classifications, and we think that administering the program without such classifications would not fundamentally alter the way Congress intended the program to operate.

Finding that the racial classifications are severable from the rest of section 1070a-15(d)(2), we need not opine on whether the section's broader authorization to serve groups that are "underrepresented in graduate education" is severable. That phrase is not defined by statute, and as we have explained, there are permissible and race-neutral ways in which the Secretary can identify members of such groups. That said, in administering this program, the Department must not consider racial or ethnic classifications and must not use other factors as proxies for such impermissible considerations.

**2.**

Turning to the regulations, we find they contain obvious and admitted "ethnic and racial" classifications, including "Black (non-Hispanic)," "Hispanic," "Alaskan Native," "Native Hawaiians," and "Native American Pacific Islanders." *See* 34 C.F.R. § 647.7(b). For the reasons we have previously discussed, the government's use of such categories triggers strict scrutiny.

But the regulations also refer to the undefined "ethnic and racial group[]" of "American Indian," *see id.*, so we must further consider whether this classification is subject to rational-basis review under *Mancari*. Nothing in the regulations suggests that this phrase should be limited to only federally recognized tribes. And the regulation's references to the other statutory definitions that constitute race classifications

further confirm that the phrase "American Indian" is being used as an "ethnic and racial" classification. *See id.*; *cf.* 20 U.S.C. § 1067k(2) ("The term 'minority' means American Indian, Alaskan Native, Black (not of Hispanic origin), Hispanic (including persons of Mexican, Puerto Rican, Cuban, and Central or South American origin), Pacific Islander or other ethnic group underrepresented in science and engineering."). After all, "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). We therefore believe that the reference to American Indians is an ethnic rather than political classification.

The regulation's racial classifications fail strict scrutiny. No compelling interest supports them. Again, neither Congress nor the Secretary has identified any specific episodes of past discrimination in the preparation for doctoral studies, much less ones that violated the Constitution or a statute. The race-based provisions of the regulations also fail narrow tailoring. To start, race is used as a negative. *See SFFA*, 143 S. Ct. at 2169. Those of a certain race are ineligible for the scholarship, unless they qualify through one of the other channels. To be sure, that members of non-designated groups can qualify in other ways (such as being low-income and first-generation) might mitigate the scale of the burden. "But there is a critical difference between the designated races and the non-designated races. The designated races get a presumption that others do not. . . . The non-designated races [face] a much higher hurdle" to qualify for the scholarship. *Vitolo*, 999 F.3d at 363.

Worse still, the regulations reify racial stereotypes, underscoring the lack of narrow tailoring. The Supreme Court has "time and again forceful-ly rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 143 S. Ct. at 2170 (citation omitted). But here, the regulations treat all members of the designated ethnicities as "disadvantaged college students" by mere fact that they share membership in an underrepresented group. *See* 34 C.F.R. §§ 647.3(c)(1)–(3), 647.7(b). The connection between personal disadvantage and group underrepresen-tation is both tenuous and overbroad. Indeed, the regulations here are even more suspect than others invalidated by courts; unlike programs that rebuttably *presume* disadvantage from one's race, these regulations assert the connection conclusively. *See, e.g.*, *Vitolo*, 999 F.3d at 357–59 (em-phasizing that the mere presumption itself is invalid); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 769–74 (E.D. Tenn. 2023)

(concluding that a rebuttable presumption that certain racial minority groups are socially disadvantaged was not narrowly tailored); *Adarand*, 515 U.S. at 206 (detailing the presumption of social and economic disadvantage).

Finally, the classifications are in some respects vague and undefined (as with "Hispanic," *see SFFA*, 143 S. Ct. at 2167), and in other respects over- or under-inclusive (as with the omission of Middle Eastern students, *see id.* at 2167–68). Although there is not a formal quota, the outsized focus on "underrepresentation" may have the same effect. *See id.* at 2170 (criticizing the argument that "race-based admissions programs will end when, in their absence, there is 'meaningful representation and meaningful diversity' on college campuses," even though the universities did not require "any 'strict numerical benchmark'" (citations omitted)).

The race-based elements of the Department's McNair regulations are therefore unconstitutional. Consistent with our interpretation of the McNair statute, the Department may promulgate new, race-neutral regulations to facilitate federal financial support to institutions of higher education for projects covered by the statute, but it must not consider—directly or indirectly—the race or ethnicity of project participants.

## I.

### Student Support Services Program

Created in 1992 as part of the HEA, the Student Support Services program is designed to, among other aims, "foster an institutional climate supportive of the success of students who are limited English proficient, students from groups that are traditionally underrepresented in postsecondary education, students with disabilities, students who are homeless children and youths . . . , students who are in foster care or are aging out of the foster care system, or other disconnected students." 20 U.S.C. § 1070a-14(a)(3); *see also* Pub. L. No. 102-325, § 402(a), 106 Stat. at 488. "Students of any race are eligible to participate in the Student Support Services Program as long as they meet the other requirements." Department of Education Memo at 18 (citing 20 U.S.C. § 1070a-14(d)(2); 34 C.F.R. § 646.3). Congress did not make any factual findings relevant to this program.

The Department has expressed concern that the Student Support Services Program is designed to benefit "students from groups that

are traditionally underrepresented in postsecondary education," 20 U.S.C. § 1070a-14(a)(3), and that this language might be used to "benefit a racial group, because of the race of the students and not because of any other shared characteristic," Department of Education Memo at 18.

We conclude that the statute is not facially unconstitutional. We have already explained in the context of the McNair program why a grant program designed to benefit underrepresented students is not facially unconstitutional. *See supra* Part III.H. The Student Support Services statute does not define the phrase "underrepresented in postsecondary education" by reference to race, and there are many possible applications of this language that are race neutral. For that reason, we cannot conclude that the program "is unconstitutional in all its applications." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).

We acknowledge, of course, that a facially valid statute could be implemented in unconstitutional ways, including if the Department limited award eligibility by regulation or practice to students of certain racial groups. Moreover, a school might use a grant "to benefit students of a particular race because of their race." Department of Education Memo at 18. That would raise serious constitutional concerns for reasons explained elsewhere in this opinion. But the implementing regulations to which you have directed us impose race-neutral eligibility criteria, *see* 34 C.F.R. § 646.3, and you have provided no information demonstrating that the program is otherwise being implemented in a race-based way. The Department can—and should—take further regulatory actions to ensure that schools do not unconstitutionally use Student Support Services grants to further racially discriminatory ends.[19]

### J.

### Access to FAFSA Data

Finally, the Department directs us to a statutory limitation on FAFSA data access. Only two scholarship-granting organizations receive a federal

---

[19] Because we conclude that the Student Support Services program is not facially unconstitutional, we do not reach the Department's second question about whether the phrase "groups that are traditionally underrepresented in postsecondary education" is severable from the statute. *See* Department of Education Memo at 18.

benefit—direct access to FAFSA data—and they receive that benefit because they confer scholarships based on race.

"Section 483(a)(2)(D) of the Higher Education Act provides that the Department may disclose the FAFSA data of an applicant to, among other entities, scholarship granting organizations that were designated prior to the date of enactment of the FUTURE Act by the Secretary as being eligible for such data sharing." Department of Education Memo at 20 (internal citation omitted); *see also* Pub. L. No. 89-329, § 483(a)(2)(D) (codified as amended at 20 U.S.C. § 1090(a)(2)(D)). As of that date, the Department had designated as eligible only two scholarship granting organizations: the United Negro College Fund ("UNCF") and the Hispanic Scholarship Fund ("HSF"). *See* Department of Education Memo at 20. Other scholarship-granting organizations may not obtain FAFSA data, even with student consent. *See id.*

Both UNCF and HSF confer scholarships based on race. As the Department has explained, "UNCF provides financial support to 'increase the total annual number of African American college graduates by focusing on activities that ensure more students are college-ready, enroll in college and persist to graduation.'" *Id.* (citation omitted). "HSF provides scholarships to HSF Scholars," who must "'identify as being of Hispanic Heritage.'" *Id.* (citation omitted).

On the facts presented to us, it is unclear whether section 1090(a)(2)(D)'s limitation of FAFSA data access to UNCF and HSF is race based, and thus whether it should be analyzed under strict scrutiny or rational basis. We think it likely that the benefit given to UNCF and HSF is race based given the function of each organization, and we have not been made aware of evidence suggesting that the benefit was allocated for race-neutral reasons. We therefore proceed on the assumption that the limitation of FAFSA data access is race based. Access to FAFSA data is a government benefit, and allocating that benefit via race-based criteria triggers "strict judicial scrutiny." *See* 1995 Guidance Memo, 19 Op. O.L.C. at 171.

Applying strict scrutiny, we are not aware of any compelling interest supported by particularized factual findings that would justify either the Secretary's use of race-based decisionmaking or Congress's limiting access to FAFSA data to scholarship-granting organizations that make awards based on race. Nor do we think that giving special governmental

benefits to these two organizations is narrowly tailored. Singling out UNCF and HSF is severely underinclusive. *See SFFA*, 143 S. Ct. at 2167–68. Many other organizations benefit black and Hispanic students, yet those organizations are categorically and inexplicably excluded from the preferential treatment accorded to UNCF and HSF. While such underinclusivity might not be fatal standing alone, this treatment also lacks other indicia of narrow tailoring. The effective carve-out for UNCF and HSF has no durational endpoint; both entities are indefinitely grandfathered into FAFSA access, with no end in sight. *See id.* at 2173 (concluding that race-based programs with "no end point" are not narrowly tailored). Finally, as far as we are aware, the government never considered race-neutral alternatives, such as providing FAFSA data to all scholarship-granting organizations regardless of whether they employ racial criteria, or expanding access based on need- or merit-based criteria. *See Grutter*, 570 U.S. at 339 ("Narrow tailoring . . . require[s] serious, good faith consideration of workable race-neutral alternatives.").

## IV.

The Supreme Court has oft reminded that strict scrutiny, as applied to racial classifications, is not invariably fatal in fact. *See United States v. Paradise*, 480 U.S. 149, 166–67 (1987); *Adarand*, 515 U.S. at 237; *Fisher I*, 570 U.S. at 314. But at times, the Court "leaves a door ajar and holds out the possibility that someone, someday might walk through it" even though "no one . . . ever will." *Edwards v. Vannoy*, 141 S. Ct. 1547, 1566 (2021) (Gorsuch, J., concurring). When the Court finally invalidated race-based admissions programs in *SFFA*, it "candidly admit[ted] what has long been apparent," *id.*—strict scrutiny is "'automatically fatal' in most cases" involving racial classifications, *Parents Involved*, 551 U.S. at 752 (Thomas, J., concurring) (citation omitted). This all-but-insuperable standard is by design, for "[e]liminating racial discrimination means eliminating all of it." *SFFA*, 143 S. Ct. at 2161. That is no less true for race-based grant programs than for race-based admissions programs.

Provided that all race-based elements identified above are set aside, we conclude that there are constitutional ways for the Department of Education to administer the MSEI, McNair, PBI competitive-grant, and Student Services Support programs, and the Department may therefore expend appropriations to administer these programs in a manner consistent with

this opinion. But the Constitution precludes the Department from maintaining its HSI, ANNHSI, NASNTI, NHCTE, and formula-based PBI grant programs. Funds appropriated for these unconstitutional programs may be repurposed or reprogrammed in appropriate circumstances. *See Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 310–11 (1969). We also conclude that 20 U.S.C. § 1090(a)(2)(D)'s limitation of FAFSA data access for race-based purposes is unconstitutional. With respect to these latter programs, we affirm that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved*, 551 U.S. at 748 (plurality opinion).[20]

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

JOSHUA J. CRADDOCK
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[20] Should the Department establish a policy not to enforce the unconstitutional portions of the programs discussed herein, or should it provide support to entities or persons otherwise ineligible or unqualified for such support in contravention of the terms of these programs, the Department should report that decision to Congress within 30 days of establishing the policy. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b)(1), (e); *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 28 n.2 (2008).